**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO.: 1:20-cv-22816**

BIG LEAGUE VENTURES, LLC.,

Plaintiff,

v.

CERTAIN UNDERWRITERS AT LLOYDS, LONDON, BRIT UW LIMITED (BY AND THROUGH SYNDICATE 2897), BEAZLEY UNDERWRITING LIMITED (BY AND THROUGH SYNDICATE 2623), CAITLIN SYNDICATE LIMITED (BY AND THROUGH SYNDICATE 2003), CINCINNATI GLOBAL DEDICATED NUMBER 2 LIMITED (BY AND THROUGH SYNDICATE 0318)

Defendant.
_____/

**COMPLAINT**

COMES NOW, the Plaintiff, BIG LEAGUE VENTURES, LLC. (collectively referenced herein as "Plaintiff"), by and through undersigned counsel, and through this Complaint hereby sues Defendant, CERTAIN UNDERWRITERS AT LLOYDS, LONDON et al. (collectively referenced herein as "Defendant"), and alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1. This is an action for damages that exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs and attorneys' fees and the Court has diversity jurisdiction over the matter pursuant to 28 U.S.C. Section 1332.

1

2. This action has been brought in the proper venue, pursuant to 28 U.S.C Section 1391, as it concerns a commercial residential insurance dispute arising out of, accruing in, culminating in, and/or situated within this Court's jurisdiction, including without limitation, Miami-Dade County, Florida.

3. At all times material hereto, the Plaintiff was and continues to be a Florida Limited Liability Company and a lawfully registered Florida entity with the Secretary of State, who receives insurance benefits in relation to the commercial residential insurance claim that is further described *supra*.

4. The Plaintiff, a Limited Liability Company, is comprised entirely of the following four (4) members:

   a. Yaakov Brafman a Citizen of Florida.

   b. Eli Weberman a Citizen of Florida.

   c. Meyer Muschel a Citizen of New York.

   d. Avrohom Kagan a Citizen of Florida.

5. "[T]he legal relationship between the Names and the insured is a vertical one: it is the individual Names, not the syndicate, who are directly liable in the event of loss, as if each Name had a contract with the Insured." *Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1085 (11th Cir. 2010).

6. At all times relevant hereto, the Defendant Names, subscribed to the subject policy of insurance are as follows:

   a. The policy is underwritten 47.6190% by Catlin Underwriting Agencies Limited (Syndicate 2003) ("Catlin"). Catlin was acquired by XL Group plc in

        2015 and is a wholly-owned subsidiary of XL group Ltd., a Bermuda corporation with its principal place of business in Bermuda. In 2018, XL Group was acquired by AXA, now called AXA XL. AXA XL is incorporated in and domiciled in the United Kingdom, which is also its principal place of business. The syndicate securing the subject policy was a corporate entity incorporated in and domiciled in the either Bermuda, or the United Kingdom, which is also its respective principal place of business, having no individual or other names or members insuring the risk.

b. The policy is underwritten 23.4286% by Syndicate 2623, an unincorporated association duly organized and existing under the laws of the United Kingdom, with its principal place of business located in London, England. The sole member of Syndicate 2623 is Beazley Underwriting Limited, a corporation organized and existing under the laws of England and Wales, with its principal place of business located in London, England.

c. The policy is underwritten 14.2857% by Syndicate 2987, an unincorporated association duly organized and existing under the laws of the United Kingdom, with its principal place of business located in London, England. The sole member of Syndicate 2987 is Brit UW Limited, a corporation organized and existing under the laws of England and Wales, with its principal place of business located in London, England.

d. The policy is underwritten 9.5238% by Syndicate 0318, an unincorporated association duly organized and existing under the laws of the United Kingdom,

with its principal place of business located in London, England. Syndicate 0318 is comprised of 390 members, the largest being Cincinnati Global Dedicated No 2 Limited, a corporation organized and existing under the laws of England and Wales, with its principal place of business located in London, England.

7. All conditions precedent to the filing of this lawsuit have occurred, have been waived, have been performed, and or been forfeited pursuant to the inequitable conduct doctrine.

## GENERAL ALLEGATIONS

8. At all times material hereto, in consideration of a premium paid by the Plaintiff, there was in full force and effect a certain homeowners insurance policy issued by the Defendant with a policy number of 77MBR-3017 (the "Policy").

9. A certified copy of the Policy is attached hereto and incorporated by reference as Exhibit 1.

10. Per the terms of the policy, Defendant agreed to provide insurance coverage to the Plaintiff's property located at located at 1231 NW 58th Terrace, Miami, Florida 33142, against direct physical loss to property.

11. On or about October 4, 2017, while the Policy was in full force and effect, the Property sustained a direct, physical, and covered loss as a result of a fire (the "Loss") which as further described below, at the very onset of being reported, the Defendant had no basis to refuse performance by way of payment of the claim.

12. Plaintiff timely notified Defendant of the loss and requested they open a claim, at which time Defendant assigned claim number 916486 to the Loss and thereafter refused to issue payment per false, deceptive, malicious, fraudulent, and unethical insistence that payment would

only be made if the Plaintiff attested that the gross undervaluation of the loss in fact constituted full value of the claim.

13. Consequently, the Plaintiff initiated this cause of action on January 18, 2018 and advised the Department of Financial Services, pursuant to the Civil Remedy Notice, of the bad faith claim handling practices of the Defendant. Subsequent thereto and pursuant to an illusory and deceptive effort to cure same, the Defendant moved to compel an "expedited appraisal" in combination with a stay of the litigation.

14. On or about June 21, 2019, an appraisal award was entered and it was not until July 19, 2019 that the Defendant performed pursuant to said award and the subject policy. In light of same, the instant action for bad faith has fully vested.

15. It has been shown, in absolute, that the Defendant underpaid the claim by hundreds of thousands of dollars and knew, or should have known, that the gross underpayment, failure to duly assess the loss, and the defenses of non-compliance with post-loss obligations, are without merit and serve to cause extra-contractual damages.

16. More specifically, as a result of the Defendants' breach, based upon information and belief, the property has fallen into a state of disrepair, rendering it a total loss, estimating roughly $300.00/square foot for teardown and rebuild for a total of $2,683,800.00. Moreover, the Plaintiff has lost business income in the amount of $234,325.00 and anticipates losing business income in the amount of roughly $120,000.00 per year. As such, the Plaintiff's current Damages stand at $2,917,125.00, exclusive of attorney's fees and costs.

17. The Plaintiff has been obligated to retain the undersigned attorney for the prosecution of this action and is entitled to a reasonable attorneys' fees and costs pursuant to

Florida Statute §§ 627.428, 626.9373, and 57.041.

## COUNT I
## STATUTORY BAD FAITH CLAIM PURSUANT TO FLA. STAT. SEC. 624.155

18. The Plaintiff adopts and realleges paragraphs 1 through 17 as fully alleged herein.

19. Pursuant to Fla. Stat. Sec. 624.155, the Plaintiff has a statutory cause of action for bad faith due to the Defendant's general business practice of willful, wanton, immoral, unlawful, malicious, and/or deceptive claims handling practices (misconduct collectively referred to as "Bad Faith").

20. The exhaustively stated basis for which this action is predicated is set forth in the civil remedies notice (CRN) provides as follows:

The Complainant insured, Big League Ventures, LLC ("Complainant"), maintained a policy of insurance with Certain Underwriters of Lloyd's, London ("Lloyd's) at the time that it suffered a loss and damages in association with a sudden and accidental fire that occurred on October 4, 2017. That said, Lloyd's knew, or should have known that the loss was covered from the onset, and for the reasons further outlined below and per the legal authorities cited, has engaged in a general business practice of bad faith claim handling policies, procedures, guidelines, protocol, valuation and payment of the claims. 1.) From the onset of the loss and adjustment, Lloyd's had no basis to dispute coverage, yet, withheld payment of the undisputed amounts of the loss for no good cause. 2.) Lloyd's agent, adjuster and/or authorized vendor, Bob Davis, who was tasked with adjusting the loss, admittedly was unduly delaying the payment of the covered loss due to the fact that he was inundated with claims. Mr. Davis and/or Lloyd's unwillingness to make the necessary accommodation for the Complainant constitutes a gross disregard for the interest of the Complainant in relation to a loss that they knew had displaced multiple residents of the subject property. 3.) Matt Hoffman, another agent, adjuster and/or authorized vendor for Lloyd's, acknowledged that Lloyd's adjustment of the loss was based on Mr. Davis recommendations. 4.) It is without dispute that in advance of Mr. Davis preparation of an estimate, Lloyd's knew, or should have known, that monies were promptly owed and needed by the Complainant for loss of rental income, moisture assessments, moisture remediation, costs associated with fire/soot remediation and assessment, etc. Irrespective of adjusting all amounts owed for the loss under various sections of the policy, Lloyd's had a duty to immediately issue payment. That said, Lloyd's disregarded said duty, and as part of its bad faith general business practices, waited until the 11th hour to demand upon the Complainant that it execute

a sworn proof of loss which attested to the fact that the Complainant did not dispute the assessed scope and value of the loss which was presented for the first-time months after the loss occurred. Payment was said to be contingent on the sworn proof of loss, which completely defies common sense and industry standards, since, the purpose of a sworn proof of loss is to obtain an insured's (as opposed to insurer's own self-serving position) representation as to, inter alia, the scope and value of the loss. It is apparent that Lloyd's is utilizing this practice to unlawfully shield itself from litigation and liability under false, deceptive, immoral and unlawful pretenses, and it certainly should know that coercionary conduct is patently unacceptable. 5.) To draw greater specifics in reference to the considerations set forth above, undersigned counsel was obliged to send correspondence to Matt Hoffman on January 5, 2018, which stated as follows: From: Jose Font Sent: Friday, January 05, 2018 10:20 PM To: 'mhoffman@pibadjusters.com' <mhoffman@pibadjusters.com> Cc: Caroline Carollo <ccarollo@fontnelson.com>; Bianca Diener <bdiener@fontnelson.com>; Amanda Sanichar <asanichar@fontnelson.com>; Sara Ortiz <sortiz@fontnelson.com>; Vanessa Gomez <vgomez@fontnelson.com>; Nicole Kronen <nkronen@fontnelson.com>; Pleadings <pleadings@fontnelson.com>; Jennifer Wilds <jwilds@fontnelson.com>; Nicole Kronen <nkronen@fontnelson.com> Subject: FW: 916486 Big League Ventures LLC - Fire Claim - Estimate Importance: High Good Evening, As an initial matter, thank you for disclosing today that you were going to advise the insurer that you are of the position that coverage has been established and that monies are due and owing per various sections of the policy. That said, and to be clear, I also acknowledge your representation that the insurer is free to reject your recommendations notwithstanding the fact that they have retained your company to serve as their representative and adjuster throughout the protracted claim process. To avoid any misunderstandings moving forward, I will further set for today's discussions below: 1.) You stated that as a condition to payment the insurer is now requesting for the first time that the insured execute a sworn proof of loss that corresponds with your estimate that was just submitted. Furthermore, you stated that the sworn proof of loss needed to include my client's attestation that the amounts set forth constituted an undisputed agreement on their part with your estimate and payment recommendations. Respectfully, we reject the conditions to payment as presented. To the extent conveyed throughout this process, and is it relates to the various sections of coverage under the policy, it is my understanding that at this point the insurer has no basis in fact and/or law to dispute that monies are presently due and owing. If there is a basis to conclude to the contrary, please advise of same in response to this email. Otherwise, and as clearly provided for by law, including the adjuster code of ethics, we must insist that: the insurer immediately confirm that payment will be issued; the insurer reveal the time, method, basis, considerations and amount upon which payment is going to be issued; delivery be had to my Firm's address as listed below and without listing my Firm (or any other Firm) as an additional payee; and the insurer disclose, along with their licensing or certification,

7

all personnel/vendors utilized to determine the equitable, prompt and full payment for this covered loss. 2.) Due to a multitude of actions and inactions on the part of the insurer, a suit was filed in this matter last week. 3.) Although you called and spoke to our client directly today, please refrain from any ex-parte communication with our client. 4.) Since litigation is pending, any and all further agreements that are to be reached need to take place through counsel as mandated by governing law. If you draw disagreement with our discussions as memorialized above, please advise of same in a meaningful, specific, substantive and written form. Also, and to further effectuate a prompt, final and equitable resolution, we also request that you provide the contact information for the insurer's retained counsel. On a final note, please be advised that I will be serving as lead counsel, and that my Partner, Ms. Carollo, will also be working on this matter along with the other lawyers and paralegals copied on this email. Have a great weekend. Best Regards, Jose P. Font, Esq. 6.) The subject property has three floors and 18 units, and the loss occurred in unit 9, which is located on the second floor and has a series of units above and below it that were clearly exposed to soot throughout the interior sections of the walls and ceilings. However, Lloyd's afforded no regard for the fact that the Complainant would have to incur the costs of retaining a specialized fire remediator to implement IICRC and industry guidelines to duly remediate the soot. 7.) Lloyd's, it agents and/or vendors, know, or should know, that failing to allow for proper fire/soot remediation serves to the detriment of the insured on a multitude of levels beyond underpayment, which includes, but is not limited to, creating toxic conditions that can serve to cause health hazards and concealed damages that continue to accrue unbeknownst to the insured over the course of time. 8.) If Lloyd's had bothered to implement proper fire remediation protocol, it would have known that the piece meal repairs as set forth for the subject units constitute an objective and undeniably gross underpayment of the claim which forced the Complainant into a position of having to incur further delay and consequential damages, including, attorney's fees, costs, loss income, contractual and extra-contractual. Either Mr. Davis, Mr. Hoffman and/or Lloyd's assigned personnel were not qualified to adjust the fire loss, or they grossly and/or intentionally disregarded the Complainant's interests. 9.) The only cost-effective means to remediate soot under the circumstances described was to allow for a complete tear out of all building materials throughout all the neighboring units that were exposed to soot as indicated. As such, Lloyd's new that it was required to pay the costs associated with the removal and replacement of all materials throughout. 10.) The structural support for the floors throughout the second and third floor consists of wood, that per open and obvious conditions and considerations, had been compromised in a multitude of units for which such repair costs were not appropriated. 11.) Lloyd's has implemented as a general business practice the arbitrary appropriation of substantial depreciation deductions for which they know, or should know, are unlawful, deceptive, unfair, immoral and/or false means to underpay their insureds Lloyd's knows that depreciation assessments need to be assessed on an item by item basis, and in instead of doing so, Lloyd's disregards the insured's interest and utilizes a

formulaic process that it knows, or should know, would be inadmissible in a court of law due to its inherently unreliable nature. To duly appropriate depreciation in a reliable fashion, Lloyd's knows that it would have to incur substantial costs in the form of a qualified expert, who, would be charged with: gathering sufficient facts and data to formulate an opinion; develop reliable principles and methods; and apply the reliable principles and methods to gathered facts and data. In this case, depreciation appropriated allowed for a significant underpayment and breach of the policy as governed by Florida Law. 12.) As a function of extinguishing the fire, the insured property was exposed to significant moisture within the interior of various residential units. That said, Lloyd's knows, or should know, that they had a duty to issue payment for necessary water/moisture assessment and remediation. Moreover, at a bare minimum, the cost of assessing mold and other toxic conditions that naturally develop within a residence when exposed to moisture for a few days. As a general business practice, and in the aggregate probably serving to save Lloyd's millions of dollars in payouts, Lloyd's pays no regard for the subject course of work that they know to be necessary. 13.) The valuations and scope of repair throughout the estimate, and per a calculated means of improperly utilizing a software system to underpay their insureds, Lloyd's knows that the amounts appropriated are deficient at least in part. 14.) The nature of the damage in question necessitated substantial electrical repairs to be performed, to which, Lloyd's paid little regard for the Complainant's interest in terms of payment and/or otherwise. All indications are that Lloyd's did not retain a qualified electrician to duly assess the scope and value of the repair, and for financial gain, such general business practice is implemented as a matter of course even when there is an admitted electrical issue for which their retained vendor/agent/adjuster is known to be unequipped to draw a duly qualified opinion. 15.) There were a significant number of windows that were damaged due to the subject loss, to which, Lloyd's paid little regard for the Complainant's interest in terms of payment and/or otherwise. All indications are that Lloyd's did not retain a licensed window contractor to determine the reasonable and necessary scope, value and form of replacing the windows in question. Lloyd's knows that their retained adjusters are legally obliged to retain experts if the adjustment necessitates same, but as a general business practice as alluded to, said obligation is disregarded in an effort to advance their own financial interest in a form that serves to the detriment of insureds such as the Complainant. 16.) Lloyd's knew that in order to maintain continuity as provided for by law and the governing policy, the Complainant was entitled to the costs associated with refinishing all of the exterior walls. They disregarded this duty by allowing for piece meal repairs to only the immediate areas wherein there was damage. 17.) Due to the nature of the loss as described, Lloyd's knew that the Complainant would have to incur substantial costs associated with replumbing the affected areas. Once again, Lloyd's did not bother to retain licensed contractors to duly indemnify the Complainant for the covered loss. 18.) As a consequence of Lloyd's bad faith practices, the Complainant was forced to retain counsel to seek relief by way of a suit for breach of contract and declaratory relief. That said, and even though obliged to do so pursuant to Fla. Stat. Sec.

9

627.428 and 57.041, Lloyd's has failed to exercise reasonable efforts to assess the scope and amount of the reasonable attorney's fees and costs incurred so that the undisputed amount thereof could be issued to the Complainant's counsel. Moreover, they have failed to issue a payment as recommended per the only known adjusters that were charged with assessing the scope and value of the loss. 19.) Knowing that it was not so, Lloyd's adjuster recommended payment that was predicated on the ability to remove and reset (as opposed to replace) various materials throughout the property that were exposed to soot and simply not subject to being reutilized due to the cost prohibitive nature of the associated labor considerations and/or otherwise. 20.) Without any consideration for true market values, Lloyd's appropriated labor costs for various licensed contractors that they knew, or should have known, fell grossly below market values. 21.) Although admittedly covered and owed based on an actual cash value basis, Lloyd's adjuster did not appropriate any monies for taxes, insurance, permits and fees. 22.) Although there was an appropriation made of $2,500.00 for architectural/drafting fees, said item is listed as a "bid item" and would require an actual licensed engineer to equitably assess the value of same per the totality of the circumstances at issue. The reality is that there are a multitude of licensed contractors/experts that are needed to work in conjunction with an engineer and general contractor to duly assess the necessary engineering and permitting, and Lloyd's has left the Complainant to fend for itself due to their interest in delaying payment, avoiding expert/contractor fees, and forcing the Complainant into the dilemma of having to perform inadequate and/or ultimately duplicative repairs, or in turn, face consequential and extra-contractual damages in relation thereto. 23.) Lloyd's investigation, adjustment and payment of a claim as a matter of course is affected by whether an insured is represented by a public adjuster and/or a lawyer is retained to file suit to secure the insured's rights. In other words, and only when pressed to issue payment by way of a suit or a public adjuster, Lloyd's refuses to fulfill its obligations to the insured in accordance with the policy/contract and their own admissions per payments associated with similarly situated clams. To cure the above stated immoral, deceptive, unlawful and generally described bad faith conduct which is part of a general business practice that is knowingly, or with a reckless disregard for the insured's interest, being utilized by Lloyd's for financial gain, Lloyd's must confess error in the legal proceedings that were initiated by the Complainant in relation thereto, and in so doing, also: stipulate to the Complainant's entitlement to attorney's fees and costs pursuant to Fla. Stat. Sec. 627.428 and 57.041; stipulate that the Complainant is not legally obliged to conditions that have been; issue payment to the Complaint per an amount that corresponds with its duty to duly adjust and issue payment of the undisputed amount of the loss; stipulate that the Complainant is entitled to judgment in its favor as it relates to its petition for declaratory relief that is currently pending; issue payment for the statutory interest that applies to the claim when paid, and to the extent that any remaining dispute as to law or fact remains as to the amounts owed, exercise a good faith effort to reach an equitable settlement.

21.     In turn, Defendant responded to the CRN, as set forth in Exhibit 2, and for which the evidence that will be presented will establish that said response is without merit, as further substantiated by the subsequent appraisal award.

22.     Ultimately, and as set forth as Exhibit 3, the Defendant's own appraiser agreed that, at a very minimum, an additional $177,562.21 were due and owing, executed an appraisal order on or about June 21, 2019 and it wasn't until July 19, 2019, which was twenty (20) months after the loss that the Defendant issued payment.

23.     It is without dispute that in advance of Defendant's preparation of a pre-suit estimate of damages, and even at the time that its appraiser executed an appraisal award, Defendant knew, or should have known, that monies were promptly owed for interest, rental value, cost associated with soot and mold assessment, damages that were left unaccounted for as a consequence of not performing the necessary diagnostics and assessments, the cost of temporary repairs, and additional law and ordinance.

24.     Pursuant to the aforementioned award, as well as the Defendant's representations that liability is not in dispute, the Plaintiff's bad faith action is ripe. *Cammarata v. State Farm Florida Ins. Co.*, 152 So. 3d 606, 613 (Fla. 4th DCA 2014) (finding "the appraisal award 'constitute[d] a 'favorable resolution' of an action for insurance benefits, so that [the Plaintiff] … satisfied the necessary prerequisite to filing a bad faith claim"); *Sammy Sterling Holdings, LLC v. United States Aircraft Ins. Group*, 16-CIV-21230, 2016 WL 8679130, at *4 (S.D. Fla. June 23, 2016) ("[I]t is well established that a plaintiff may bring a section 624.155 action against an insurer without obtaining a precise determination of damages in prior coverage action, and the amount of damages may be determined may be determined in the section 624.155 action.")

25. The predicate CRN was duly filed with the Florida Department of Financial Services on January 16, 2018, and was served upon the Defendant by way of, *inter alia*, service of the State Court Breach of Contract Complaint on or about January 18, 2018.

26. For the above stated reasons, the Plaintiff is entitled to punitive damages, attorneys' fees, extra-contractual damages, and costs.

WHEREFORE, the Plaintiff, pursuant to Fla. Stat. Secs. 624.155, 626.9541, 57.041, 55.03 627.428, 626.9373, 627.70131 and governing Florida Law, respectfully demands judgment be entered against the Defendant and in the Plaintiff's favor as follows:

a. Full payment of direct, actual and/or indirect extra-contractual damages;

b. An award of punitive damages;

c. An award for reasonable attorneys' fees and costs for obtaining a judgment, order or decree adverse to the Defendant and/or in favor of the Plaintiff's rights under the Policy;

d. Payment of statutory, prejudgment and post-judgment interest; and/or

e. Any other relief the Court deems just and proper.

## JURY DEMAND

The Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

**FONT & NELSON, PLLC**
Attorney for Plaintiff
200 South Andrews Ave., Suite 501,
Ft. Lauderdale, Florida 33301
Tel: (954) 248-2920
Fax: (954) 248-2134
Email: pleadings@fontnelson.com

BY:     /s/ *Adam Friedman*
          **JOSE P. FONT, ESQ.**
           Florida Bar #:  0738719
          **ADAM M. FRIEDMAN, ESQ.**
           Florida Bar #: 0099408

13

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of July, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**BERK, MERCHANT & SIMS, PLC**
William S. Berk / FBN: 349828
Illon R. Kantro / FBN: 26296
Austin J. North / FBN: 111683
2 Alhambra Plaza, Suite 700
Coral Gables, Florida 33134
Telephone: (786) 338-2900
Facsimile: (786) 338-2888
E-Mail: wberk@berklawfirm.com
ikantro@berklawfirm.com
lspaulding@berklawfirm.com
anorth@berklawfirm.com
kmendez@berklawfirm.com